[No. B038575. Second Dist., Div. Seven. Sept. 26, 1990.]

RALPH MONZON et al., Plaintiffs and Respondents, v. SCHAEFER AMBULANCE SERVICE, INC., Defendant and Appellant.

COUNSEL

Bien, Summers & Dale, Elliot L. Bien, Bronson, Bronson & McKinnon and Robert W. Tollen for Defendant and Appellant.

Musick, Peeler & Garrett, Richard J. Simmons, Kelly L. Hensley, Nancy N. McDonough and Carl G. Borden as Amici Curiae on behalf of Defendant and Appellant.

Gerald Gress for Plaintiffs and Respondents.

H. Thomas Cadell, Jr., as Amicus Curiae on behalf of Defendant and Appellant and on behalf of Plaintiffs and Respondents.

## OPINION

**WOODS (Fred), J.**—The major issue raised by this appeal relates to the proper method to use in calculating overtime. We hold that the proper method to use in calculating overtime is one in which the employer must identify at week's end all hours worked by an employee during that workweek and pay overtime based upon the excess of total hours over the greater of either: (1) eight hours in a workday, including double time, or (2) forty hours in a workweek.

We further hold that it is permissible for an employer and ambulance drivers and attendants to enter into an agreement, which need not be in writing, to exclude up to eight hours of sleep time from compensable time on twenty-four-hour shifts if certain conditions, hereafter discussed, are met.

### FACTUAL AND PROCEDURAL SYNOPSIS

1. *Procedural Background*

On April 19, 1983, respondents filed their complaint to recover unpaid or underpaid wages. Respondents are covered by Industrial Welfare Commission (IWC) Order No. 9-80 (Order 9-80), which regulates the transportation industry. (Cal. Code Regs., tit. 8, § 11090.) The claim of each of the nine respondents begins on January 1, 1980, a date during the course of their employment, and ends with their respective termination dates.

The at-issue memorandum was filed on January 22, 1988. At the March 1988 trial setting conference, a trial date of April 4, 1988, was set. ██ ██ ██ ██ At appellant's request, the date was then changed to April 18.[1]

Due to court congestion, the case was trailed to April 19 and then again to April 20. On April 20, 1988, the case was continued to July 26, 1988, because the court had to see if one of the cases in what it designated "the rescue program" was going to be resolved.

At the request of the presiding judge, on April 19 and 20, the parties deliberated over payroll calculations and arrived at an agreement as to the amount of unpaid wages which would be owing to respondents if they prevailed on the legal issues. The agreement, which was later stipulated to in open court, reduced the estimated time for trial from 12 to 2 days and was the basis of the judgment eventually entered.

On May 6, 1988, appellant filed a motion to dismiss pursuant to the five-year mandatory dismissal statute, i.e., Code of Civil Procedure section 583.310, on the ground that the delay from April 18 to April 20 was not due to the unavailability of a courtroom, but rather due to respondents' failure to prepare their backpay calculations. The motion was denied.

After a court trial, the court ruled that Order 9-80 section 3(G) meant that any agreed amount of time might be excluded from time worked so long as the exclusion was in writing and there was a regularly scheduled and uninterrupted sleeping period. The court found that appellant's policy regarding sleep periods did not meet the requirements of Order 9-80 section 3(G) since there was no agreement in writing and no regularly scheduled sleep periods, and therefore every hour of every shift was compensable time, with the exception of the two 1-hour meal periods.

The court adopted respondents' version of the overtime rates required and imposed time and a half rates on every hour of work after the second shift in a week.

---

[1] The evidence supporting the change of date is contained in appellant's reply to opposition to its summary judgment motion. Generally, statements in a brief are not part of the record on appeal (*People* v. *Young* (1978) 85 Cal.App.3d 594, 608 [149 Cal.Rptr. 524]) and may not be considered on appeal unless supported by the record. (*People* v. *Merriam* (1967) 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161] disapproved on another point in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].)

However, although briefs are outside the record, they are reliable indicators of a party's position on the facts, and a reviewing court may make use of statements therein as admissions against the party. (*DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1019, fn. 3 [242 Cal.Rptr. 368].)

The court denied appellant's motion for judgment against the four respondents who had not appeared at trial and entered judgment in favor of all respondents on September 21, 1988.

Appellant's motion for a new trial was denied.

Appellant filed a timely notice of appeal.

2. *Appellant's Compensation System*

Respondents are nine employees who worked as ambulance drivers or attendants at appellant's station in Pomona between 1976 and 1982. Respondents had freely chosen to work on 24-hour shifts, every other day, rather than the 12-hour shifts that were also available.

The deposition testimony of each employee demonstrated that he understood that he would not be paid for eight hours of uninterrupted sleep.

Employees worked seven twenty-four-hour shifts in each two-week period. They worked three days each week, plus every other Saturday or Sunday. Employees were on call throughout their 24-hour shift.

Shifts began at either 7 a.m. or 8 a.m. Regardless of actual duty calls, respondents received 14 hours of pay at straight time. Beyond that, time actually spent on duty calls was paid at time and a half. All hours of work were paid at time and a half once an employee had worked more than 40 hours of straight time in 1 week.

In determining whether an employee was entitled to any additional pay beyond the 14 guaranteed hours on each 24-hour shift, up to 2 hours were excluded from compensable time for 2 meal periods, assuming that meal periods were actually available on a given day.[2] If a meal period was not actually available due to work responsibilities, the employees were paid time and a half.

The remaining eight hours of each twenty-four-hour shift were excluded from compensable time as a sleep period if there were at least five hours available for sleep.[3] If less than five hours were available for sleep, appellant

---

[2] Respondents did not dispute that they did not have to be paid for mealtime.

[3] The law did not require that the five hours be in a row. Appellant adopted that practice on its own. After August 1982, appellant only required that the five hours for sleep be in blocks of two or three hours. That system only involved the last two months of one respondent's tenure.

admitted it was required to pay for all eight hours of the sleep period.[4] If there were at least five hours in a row available for sleep, appellant only paid for the post-7 p.m. hours that an employee actually worked. In case of any doubt about the exact time involved, appellant always gave the employee the benefit of the doubt and considered it working rather than sleeping time.

Employees were usually not told in advance when their sleep period began. Employees rarely received eight hours of sleep during their shift and did not receive a minimum of five hours sleep most of the time.

No records were kept of actual sleep periods. Records were kept of ambulance runs that were made. The next day's dispatcher would look at the record of runs made the previous night and determine if there were any five-hour gaps. If there were any five-hour gaps, the employees would not be considered for sleep-time pay. Employee mealtimes were not recorded on the call cards that were examined for sleep-time gaps. If employees were not out on a run, they could be performing other duties such as cleaning, stocking or paperwork, instead of sleeping.

There was conflicting evidence over the question whether respondents had ever agreed in writing to the foregoing arrangements governing meal and sleep periods. The five employees who testified at trial denied entering into a written employment agreement with appellant. Appellant's manager testified that he personally witnessed every one of the employees sign a rules and regulations employment agreement that set forth appellant's compensation system. No such agreement between any employee and appellant was produced at trial. The only agreement introduced into evidence was an employment agreement for 24-hour shifts signed by respondent Ralph Monzon in August 1982. Monzon testified that he thought the agreement he signed was a W-2 form.

## CONTENTIONS

1. Since court congestion only tolls the five-year statute for plaintiffs who have diligently sought trial, this case is subject to mandatory dismissal.

2. The trial court improperly ordered payment at overtime rates for hours exceeding the daily limit and then counted those same hours toward the weekly overtime trigger of 40 hours, leading to a pyramiding of overtime hours.

---

[4] Appellant concedes that it had been erroneously paying for only five hours in this situation when it should have been paying for eight hours when the five hours of sleep were not available and that the judgment properly includes compensation for this error. Appellant is appealing the award of compensation for an eight-hour sleep period on all shifts.

3. The court improperly ordered compensation for all eight hours of the sleep period every night.

4. The court erred in denying appellant's motion for judgment as to the four employees who did not appear at trial.

### DISCUSSION

### I. APPELLANT'S MOTION TO DISMISS WAS PROPERLY DENIED SINCE THE MATTER WAS TRAILED DUE TO COURT CONGESTION

"An action shall be brought to trial within five years after the action is commenced against the defendant." (Code Civ. Proc., § 583.310.) The five-year period is tolled when it is "impossible, impracticable, or futile" to comply therewith. (Code Civ. Proc., § 583.340, subd. (c).)

■ A trial court's ruling on a motion to dismiss under Code of Civil Procedure section 583.310 will be disturbed only upon a showing of a manifest abuse of discretion. (*Baccus* v. *Superior Court* (1989) 207 Cal.App.3d 1526, 1531 [255 Cal.Rptr. 781].) ■ What is impossible, impractical or futile must be interpreted liberally, consistent with the policy favoring trial on the merits. (*Id.* at p. 1532.)

■ Citing to *Goers* v. *Superior Court* (1976) 57 Cal.App.3d 72 [129 Cal.Rptr. 29], appellant concedes that court congestion is one of the conditions that can be used to avoid mandatory dismissal, but contends that the unavailability of a courtroom should not have tolled the mandatory five-year deadline in this case because respondents had not exercised diligence in moving their case toward trial. Appellant argues that respondents were not diligent because they did not file their at-issue memorandum until three months before the five-year deadline, did not file a motion to advance and were not adequately prepared for trial on the scheduled trial date.

In the statement of facts contained in appellant's opening brief, appellant states that when the case was called for trial, the supervising judge inquired of counsel about their readiness for trial. Then, upon learning that respondents could not state the amount of backpay they should be awarded if they prevailed, the supervising judge determined that the case was not ready for trial and stated that he would not allow the time of a trial judge to be taken up with such calculations. Appellant also claims that although the supervising judge may have stated that no courtroom was available, "other cases were in fact being sent to trial."

The evidence which appellant cites for this last "fact" is its reply brief filed in the trial court in support of its motion to dismiss. Appellant's

counsel uses the reply brief as a declaration by declaring under penalty of perjury that he had first hand knowledge of the factual matters contained in the reply brief.[5]

The reply brief states that "it was the understanding of counsel for [appellant] that other cases were being assigned for trial . . . ." Counsel's understanding that cases were being assigned is not first hand knowledge and does not support his blatant statement that cases were in fact being sent to trial.[6]

Such loose references to the record strain counsel's credibility before this court especially in light of the supervising trial judge's statement at the hearing on the motion to dismiss that he recalled the case because he had been upset with respondents' counsel for not being adequately prepared to discuss settlement. The judge then stated that: "I had to trail the matter for a couple of days to see if I could get it out to see if one of the cases that we had in the rescue program was going to be resolved, and the matter had to be continued because of the rescue program, . . . Even though this is a five year case of our own, *we just had no courtroom available*, . . ." (Italics added.) It is evident to us that the supervising judge trailed the case due to court congestion, not respondents' lack of preparation.

Appellant's motion to dismiss was based on a claim that the delay from April 18 to April 20 was not due to the unavailability of a courtroom, but rather to respondents' failure to prepare their backpay calculations, leading the supervising judge to find that the case was not ready to be assigned to a trial judge. At the very end of the motion, appellant states that the supervising judge set the matter for trial notwithstanding the late filing of the at-issue memorandum and the lack of a motion to specially set the case for trial. Appellant then mentions that respondents did not warrant the court's consideration because of their subsequent lack of preparation (i.e., the backpay calculations) and concluded that the failure to obtain a trial date within the five-year deadline was due to respondents' lack of diligence.

Respondents' counsel asserted that he responded ready for trial on April 18, was prepared to present testimony on every aspect of the case, and had witnesses, including all nine respondents, in court or on call. The record

---

[5] We condemn the practice of appellant's counsel in using briefs as a vehicle to include declarations on supposedly factual issues in hopes of swaying a favorable decision from us in spite of failure to develop a sufficient record on appeal. Particularly irritating is the habit of including such a declaration in a "reply brief" which gives the respondent no opportunity for rebuttal. Such a practice borders on contempt of court.

[6] We think that it is appropriate at this time to remind counsel for both parties that compilation of more accurate statements of facts, including accurate citations to the record, in their appellate briefs would have enhanced the expeditious processing of this appeal.

does not show that the supervising judge found that the case was not ready for trial. Rather, since no courtroom was available, the supervising judge requested that the parties deliberate over the backpay calculations, which led to a stipulation and a reduction of the estimated time for trial from 12 to 2 days.

What is impossible, impractical or futile must be determined in light of all the circumstances in the individual case, including the acts and conduct of the parties and the nature of the proceedings themselves. (*Baccus* v. *Superior Court, supra*, 207 Cal.App.3d 1526, 1532.) The critical factor in applying these exceptions to a given factual situation is whether the plaintiff exercised reasonable diligence in prosecuting his or her case. (*Ibid.*) Thus, whether an exception is applicable is generally a question of fact to be determined by the trial court under a totality of the circumstances test.

It is not until its reply to the opposition to the motion to dismiss that appellant really argues that respondents were not diligent in bringing their case to trial because of the late filing of the at-issue memorandum and the lack of a motion to specially set. Since this argument was before the trial court, there is a reasonable inference that the court found that respondents had been diligent.

" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (Original italics.) (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) Under the established rules of appellate review, all factual matters are viewed in the light most favorable to the prevailing party. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) Support for an inferential finding of reasonable diligence can be seen in respondents' declaration in opposition to the motion to dismiss indicating ongoing discovery difficulties in getting the information necessary to calculate the backpay owed. Also, the record contains ample evidence that the matter was actively litigated as can be seen from the bringing of at least three motions for summary adjudication of issues, a motion for summary judgment as well as other various and sundry motions, including a combined motion for summary judgment or summary adjudication of issues heard on the eve of trial in April of 1988.

Under the circumstances of this case, we conclude that the trial court did not abuse its discretion in denying appellant's motion to dismiss. Respondents did obtain a trial date within the five years required by statute to bring

the matter to trial. Court congestion caused the trial judge to continue the matter beyond the five-year deadline.

## II. IWC ORDER 9-80

### A. *Introduction*

#### 1. *California labor law*

Labor Code section 1173 authorizes IWC to promulgate orders regulating wages, hours and working conditions throughout the state. IWC has promulgated 15 overtime orders—12 orders cover specific industries and 3 orders cover occupations—and 1 general minimum wage order which applies to all California employers and employees (excluding public employees and outside salesmen). (Cal. Code Regs., tit. 8, §§ 11010, 11020, 11030, 11040, 11050, 11060, 11070, 11080, 11090, 11100, 11110, 11120, 11130, 11140, 11150.) The overtime orders, with minor exceptions (e.g., Cal. Code Regs., tit. 8, §§ 11050, subd. (3)(C) and 11140, subd. (3)(A)), establish the same daily and weekly overtime requirements for nonexempt employees as those found in Order 9-80.

IWC is a five-member appointive board initially established by the Legislature in 1913 to regulate the wages, hours and conditions of employment of women and children. (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 700 [166 Cal.Rptr. 331, 613 P.2d 579].) Federal judicial decisions in the early 1970's holding that legislation protecting only women violated the prohibition against sex discrimination in the federal Civil Rights Act of 1964, led to legislative amendments to the Labor Code authorizing IWC to establish minimum wages, maximum hours and standard conditions of employment for all employees in this state. (*Id.* at pp. 700-701.) From its inception, IWC has been vested with broad statutory authority to establish the maximum hours of work consistent with the health and welfare of the employees. (*Id.* at p. 701.)

"Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion." (27 Cal.3d at p. 702.)

Labor Code section 1177 requires that each order of IWC "shall include a statement as to the basis upon which the order is predicated . . . ." "As to the provision for premium pay for overtime, the statements [see e.g., Statement as to the basis upon which Industrial Welfare Commission Order

No. 9-80 . . . is predicated (1979)] make it clear that such provision has become the primary device for enforcing limitation on the maximum hours of work . . . . The statements set forth the reasons supporting premium pay, to wit, it is a maximum hour enforcement device; a means of encouraging more employment; and a means of furnishing extra money to enable the employee to pay for services the employee would otherwise perform." (*California Manufacturers Assn.* v. *Industrial Welfare Com.* (1980) 109 Cal.App.3d 95, 111 [167 Cal.Rptr. 203].)

The Division of Labor Standards Enforcement (DLSE) is the body charged with administration and enforcement of IWC orders. (Lab. Code, §§ 61, 1193.5.) ■ "As interpretation necessarily precedes administration [citation], DLSE's primary responsibility is to interpret the intent of the IWC." (*Keyes Motors, Inc.* v. *Division of Labor Standards Enforcement* (1987) 197 Cal.App.3d 557, 561-562 [242 Cal.Rptr. 873].) DLSE's interpretation of an IWC order is entitled to great weight and, unless it is clearly unreasonable, it will be upheld. (*Id.* at p. 564.)

### 2. *Statutory interpretation*

■ The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law, and while an administrative agency's interpretation of its own regulation obviously deserves great weight, the ultimate resolution of such legal questions rests with the courts. (*Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].)

■ Witkin provides the following general rules of statutory interpretation: "(1) Ascertain the intent of the Legislature so as to effectuate the purpose of the law. (2) Give a provision a reasonable and common sense interpretation consistent with the apparent purpose, which will result in wise policy rather than mischief or absurdity. (3) Give significance, if possible, to every word or part, and harmonize the parts by considering a particular clause or section in the context of the whole. (4) Take into account matters such as context, object in view, evils to be remedied, legislation on the same subject, public policy, and contemporaneous construction. (5) Give great weight to consistent administrative construction." (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 94, pp. 146-147.)

### 3. *Federal authority*

■ In *Hernandez* v. *Mendoza* (1988) 199 Cal.App.3d 721 [245 Cal.Rptr. 36], a case involving the interpretation of California's overtime

requirements, the court noted that California courts have recognized that California's wage laws are patterned on federal statutes and that the authorities construing those federal statutes provide persuasive guidance to state courts. (*Id.* at p. 726, fn. 1.) Federal decisions have provided reliable authority to California courts in the interpretation of state labor law provisions which have language that differs from, but parallels that of the federal statutes. (*Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 658 [224 Cal.Rptr. 688, 715 P.2d 648].)

### 4. *IWC Order 9-80*

Order 9-80 section 3(A)[7] provides that: "The following overtime provisions are applicable to employees eighteen (18) years of age or over . . .: such employees shall not be employed more than eight (8) hours in any workday[8] or more than forty (40) hours in any workweek[9] unless the employee receives one and one-half (1 1/2) times such employee's regular rate of pay for all hours worked over forty (40) in the workweek. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

"(1) One and one-half (1 1/2) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including twelve (12) hours in any workday, and for the first eight (8) hours worked on the seventh (7th) day of work; and

"(2) Double the employee's regular rate of pay for all hours worked in excess of twelve (12) hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) day of work in any workweek."

Section 3(G)[10] provides that: "The daily overtime provision of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for twenty-four (24) hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one hour each and a regularly scheduled uninterrupted sleeping

---

[7] Unless otherwise noted, section references are to Order 9-80.

[8] Section 2(N) defines workday as: "any consecutive 24 hours beginning at the same time each calendar day."

[9] Section 2(O) defines workweek as: "any seven (7) consecutive days, starting with the same calendar day each week" and is "a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods."

[10] This section was originally designated 3(H). We have changed all references to the current designation—section 3(G).

period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule."

B. *Order 9-80 Requires That Overtime Rates Be Paid on a Weekly Basis for the Greater of the Daily or Weekly Hours of Overtime*

1. *The trial court's ruling*

There are two methods of pyramiding overtime. The first involves the simple addition of all daily and weekly overtime hours to arrive at a combined total. Under this approach, an employee who worked one nine-hour day and four eight-hour days in a workweek would be credited with one daily overtime hour, plus one weekly overtime hour, i.e., two hours of overtime. In this situation, the daily overtime hours are effectively counted twice—once for purpose of daily overtime and again for purpose of weekly overtime.

Here, the trial court analyzed the daily and weekly overtime standards separately. First, it looked at all daily hours, on a day-by-day basis, and required overtime for all hours beyond eight on each day. It then considered the 40-hour trigger and found that it was engaged as soon as a total of 40 hours, including the daily overtime hours already counted, had been worked in the week. In other words, the trial court found that the first 40 hours worked in a workweek triggered the weekly overtime rate.

The trial court stated that the statute was clear on its face and that DLSE had not considered the enforcement of both daily and weekly overtime provisions. The court found that: "[F]rom 7:00 a.m. to 5:00 p.m., . . . that is ten hours from which two meal periods could be deducted, leaving an eight-hour shift, that should be paid at regular time, from 5:00 p.m. to 9:00 p.m., that would total twelve hours, with the last four hours, that period of time the rate should be at time and half; and from the time of 9:00 p.m. to 7:00 a.m., that should be at double time; and those rates of pay would be for the first and second shift. For the third and fourth shift of a fourth period from 7:00 a.m. to 9:00 p.m., would be at the rate of one and half times a regular pay, from 9:00 p.m. to 7:00 a.m. at the rate of double time for that ten-hour period." Example (1) illustrates the method of calculating overtime used by the trial court.

Example (1)[11]

| Day | Mon. | Wed. | Fri. | Sun. | Total |
|---|---|---|---|---|---|
| Total Hours | 22 | 22 | 22 | 22 | 88 |
| | | | | | |
| Straight Time | 8 | 8 | — | — | 16 |
| Time & Half | 4 | 4 | 12 | 12 | 32 |
| Double Time | 10 | 10 | 10 | 10 | 40 |

### 2. *DLSE's interpretation*

According to its amicus curiae brief, DLSE has historically interpreted the language of Section 3(A) "to mean that the worker is entitled to recover premium overtime wages for any work in excess of eight hours in any one day *or* in excess of forty hours in any one week." (Original italics.) DLSE states that the obligation of the employer is in the alternative—the employer must pay the premium pay for either the daily overtime or the weekly overtime, but there exists no obligation to pay for both.

Amicus curiae California Association of Hospital and Health Systems et al. states that DLSE has consistently construed all the wage orders so that employers must pay the greater of an employee's daily or weekly overtime hours during the week, but not both. Unfortunately, neither DLSE nor California Association of Hospital and Health Systems has provided this court with any legal authority showing DLSE's historic interpretation.

However, DLSE's interpretation is set forth in a declaration attached to the motion for a new trial. H. Thomas Cadell, Jr., chief counsel for DLSE, stated that when an employee works twenty-two or more hours per day for three or four days, "DLSE would allow the first 8 hours each day to be paid at straight-time. We would require the ninth through the twelfth hours each day to be paid at time-and-a-half, and we would require the hours in excess of 12 each day to be paid at double-time. We would not disallow 8 hours at straight-time on the third or fourth day, merely because the total hours for the week had exceeded 40. We would consider such a practice to be 'pyramiding' or duplication of overtime pay for the same hours of work. We do not require pyramiding."

Cadell also attached to his declaration pages from the Wage and Hour Manual for California Employers, which Cadell stated set forth the correct method for calculating overtime when hours worked exceeded both the daily and weekly overtime thresholds.

---

[11] Hereafter, the examples use "AH" for actual or total hours, "ST" for straight time, "1 1/2x" for time and a half and "2x" for double time.

This manual states that the rule is that: "To avoid 'pyramiding' or duplication of overtime pay for the same hours of work, [DLSE] provide[s] that the employee must be paid overtime for all hours worked in the workweek in excess of the applicable daily maximum or in excess of the applicable weekly maximum, *whichever number of hours is greater.* For example, if the employee's total hours of work in the workweek that exceed the daily maximum are ten and the number of hours in excess of the weekly maximum are eight, overtime compensation is required for ten hours, not eight." (Italics added.) (Simmons, Wage and Hour Manual for Cal. Employers (4th ed. 1988) § 8.15(a), pp. 272-273.)

The manual goes on to give an example in which an employee works six days of ten hours each. In that case, the number of weekly overtime hours is $20 (60 - 40 = 20)$, and number of the daily overtime hours is 12 (2 hours a day $\times$ 6 = 12). Therefore, the employee would have to be compensated for the weekly overtime since it exceeds the daily overtime. (Simmons, Wage and Hour Manual for Cal. Employers *supra*, § 8.15(b) at p. 273.)

DLSE's Operations and Procedures Manual, which was also before the trial court as part of the motion for a new trial, contains no explicit language setting forth the rule that the employer must pay the greater of the daily or weekly overtime. However, two examples in the manual indicate that DLSE would not follow the method used by the trial court. (2 DLSE, Operations and Procedures Manual (1978) § 10.49, p. 11.) These examples are set out in examples (2) and (3).

Example (2)

| | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Sun. | Total |
|---|---|---|---|---|---|---|---|---|
| AH | 12 | 13 | 15 | 8 | 8 | — | — | 56 |
| ST | 8 | 8 | 8 | 8 | 8 | — | — | 40 |
| 1 1/2x | 4 | 4 | 4 | — | — | — | — | 12 |
| 2x | | 1 | 3 | | | | | 4 |

Example (3)

| | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Sun. | Total |
|---|---|---|---|---|---|---|---|---|
| AH | 9 | 10 | 6 | 7 | 13 | 8 | 9 | 62 |
| ST | 8 | 8 | 6 | 7 | 8 | 3 | — | 40 |
| 1 1/2x | 1 | 2 | — | — | 4 | 5 | 8 | 20 |
| 2x | | | | | 1 | | 1 | 2 |

Since prior to the second example (example (3) herein) the manual states that "40 hours ends in mid-shift on Saturday," it is apparent that DLSE

used 40 hours of straight time to determine the weekly trigger of 40 hours as the employee would have reached 40 hours at the 8th hour worked on Friday.

Accordingly, it appears that in computing Section 3(A)'s requirement of premium pay "for all hours worked over forty (40) in the workweek," DLSE looks to all hours worked in excess of 40 regular or straight time hours, not the first 40 hours of work in the workweek.

In this case, following DLSE's method would have led to the result illustrated below in example (4).

Example (4)

| | Mon. | Wed. | Fri. | Sun. | Total |
|---|---|---|---|---|---|
| AH | 22 | 22 | 22 | 22 | 88 |
| | | | | | |
| ST | 8 | 8 | 8 | 8 | 32 |
| 1 1/2x | 4 | 4 | 4 | 4 | 16 |
| 2x | 10 | 10 | 10 | 10 | 40 |

■ "[L]awmakers are presumed to be aware of long-standing administrative practice and, thus, the reenactment of a provision, or the failure to substantially modify a provision, is a strong indication the administrative practice was consistent with underlying legislative intent." (*De Young* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18-19 [194 Cal.Rptr. 722].)

Labor Code section 1173 directs IWC to continually review and update its rules, regulations, and policies to provide adequate and reasonable wages, hours, and working conditions. DLSE is required to furnish copies of its enforcement policies to IWC. (Lab. Code, § 1198.4.)

Section 10.49 (WAGES, OVERTIME) was apparently added to DLSE's Operations and Procedures Manual in March 1978. Examples 1 and 2 of that manual (examples (2) and (3) herein) illustrate DLSE's method of calculating overtime when an employee works both daily and weekly overtime. When IWC promulgated a new wage order in 1980, it made only minor changes in the language of section 3 of the previous wage order. (See Cal. Admin. Code., tit. 8, § 11460, Register 76, No. 41-B (Oct. 9, 1976).) ■ Even though these are only illustrations of DLSE's rule rather than a clear statement of the rule, the fact that IWC did not change the language of the wage order indicates that DLSE's practice was consistent with IWC's intent in enacting the overtime provisions.

### 3. *Appellate decision*

In *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239 [211 Cal.Rptr. 792], a case involving computing overtime for employees who work a fluctuating workweek, one appellate court followed the method approved by DLSE. The court gave the following example of a workweek:

| Day | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Sun. | Total |
|-----|------|-------|------|-------|------|------|------|-------|
| Hours | 12 | 14 | 14 | 8 | 16 | 10 | 14 | 88 |

The court stated that: "the employee would be entitled to 40 hours at straight time . . . , 34 hours at time and one-half, and 14 hours at double time . . . ." (165 Cal.App.3d at p. 249.) The method of calculating those hours is illustrated in example (5).

Example (5)

| | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Sun. | Total |
|-----|------|-------|------|-------|------|------|------|-------|
| AH | 12 | 14 | 14 | 8 | 16 | 10 | 14 | 88 |
| ST | 8 | 8 | 8 | 8 | 8 | — | — | 40 |
| 1 1/2x | 4 | 4 | 4 | — | 4 | 10 | 8 | 34 |
| 2x | | 2 | 2 | | 4 | | 6 | 14 |

Had the *Skyline* court used the method adopted by the trial court, it would have concluded that the employee was entitled to 24 hours at straight time, 50 hours at time and one-half, and 14 hours at double time. The calculations for such a computation are illustrated in example (6).

Example (6)

| | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Sun. | Total |
|-----|------|-------|------|-------|------|------|------|-------|
| ST | 8 | 8 | 8 | — | — | — | — | 24 |
| 1 1/2x | 4 | 4 | 4 | 8 | 12 | 10 | 8 | 50 |
| 2x | | 2 | 2 | | 4 | | 6 | 14 |

### 4. *Unreasonable consequences*

" '[W]here the language of a statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be

adopted.' " (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157].) The avowed purpose of the imposition of premium wages is to discourage the employer from working the employee excessive hours. (*Industrial Welfare Commission* v. *Superior Court, supra,* 27 Cal.3d 690, 713.)

An absurd consequence of the trial court's approach is that an employee who worked the same number of hours on the same number of days would be paid different amounts of overtime depending on when in the workweek the days were worked. In example (7) below, the employee works eight-hour shifts on four days and twenty-two hour shifts on two days.

Example (7)

DAYS

| Week 1 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Total |
|---|---|---|---|---|---|---|---|---|
| AH | 8 | 8 | 8 | 8 | 22 | 22 | — | 76 |
| ST | 8 | 8 | 8 | 8 | 8 | — | — | 40 |
| Overtime Hrs. | — | — | — | — | 14 | 22 | — | 36 |
| Week 2 | | | | | | | | |
| AH | 22 | 22 | 8 | 8 | 8 | 8 | — | 76 |
| ST | 8 | 8 | — | — | — | — | — | 16 |
| Overtime Hrs. | 14 | 14 | 8 | 8 | 8 | 8 | — | 60 |

We disagree with the trial court that the statute is clear on its face. Section 3(A) provides that an employer cannot work an employee more than a set number of daily or weekly hours unless the employee is paid overtime. The statute does not provide that weekly overtime must be paid in addition to daily overtime.

As can be seen in example (1), using the trial court's method of calculating overtime means that for an 88-hour workweek, appellant had to pay for 72 hours of overtime and only 16 hours straight time. Although with 24-hour shifts, an employer may not be able to schedule 40 hours of straight time, in general, the wage orders establish 40 hours as the standard workweek. (Statement as to the basis upon which Industrial Welfare Commission Order No. 9-80 . . . is predicated, *supra,* § 3.)

Providing for premium pay when an employee's hours exceed either the daily or weekly limit will accomplish IWC's goal of enforcing maximum hours in most industries. (Statement as to basis upon which Industrial Welfare Commission Order No. 9-80 . . . is predicated, *supra,* § 3.) Al-

though it is obvious that even harsher premium pay requirement would discourage the practice even more, in our opinion, the trial court's method of counting the daily overtime hours towards the weekly trigger, is excessively punitive because it deprives the employer of a basic workweek at straight time pay. Accordingly, we conclude that it was not unreasonable for DLSE to count only straight time hours towards the 40-hour trigger.

DLSE's rule of requiring payment for the greater of daily or weekly overtime hours needs one point of clarification. In determining the greater of daily or weekly overtime hours, the employer should consider whether the daily overtime includes double time. Thus, even though daily and weekly overtime result in the same number of hours of overtime worked, the comparison must take into account not only the number of hours worked, but also the compensation earned. Example (8) shows an example of a workweek in which daily overtime should be paid.

Example (8)

| | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Sun. | Total |
|--------|------|-------|------|-------|------|------|------|-------|
| AH | 22 | 8 | 8 | 8 | 8 | — | — | 54 |
| ST | 8 | 8 | 8 | 8 | 8 | — | — | 40 |
| 1 1/2x | 4 | | | | | | | 4 |
| 2x | 10 | | | | | | | 10 |

In example (8), the weekly overtime is 14 (54 — 40), and the daily overtime is also 14. However, since the daily overtime includes 10 hours of double time, the employee should be paid for the daily overtime.

Furthermore, although all the parties appear to agree that DLSE used a particular interpretation of section 3(A), we look to federal statutes as further support for this interpretation.

## 5. *Federal interpretation*

██ California's wage orders are closely modeled after (although they do not duplicate), section 7(a)(1) of the Fair Labor Standards Act of 1938 (FLSA). (29 U.S.C. § 207(a)(1).)[12] (*Alcala* v. *Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 550 [227 Cal.Rptr. 453].) "It has been held that when

---

[12] 29 United States Code, section 207(a)(1) provides that: "[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

California's laws are patterned on federal statutes, federal cases construing those federal statutes may be looked to for persuasive guidance." (*Ibid.*)

"The legislative policy of the overtime provisions of [FLSA] is to spread employment throughout the work force by putting financial pressure on the employer, and to compensate employees for the burden of overtime work-weeks." (*Brennan* v. *Elmer's Disposal Service, Inc.* (9th Cir. 1975) 510 F.2d 84, 87.) The express purpose of FLSA is to eliminate " 'labor conditions' detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." (*Bumpus* v. *Continental Baking Co.* (6th Cir. 1941) 124 F.2d 549, 551 [140 A.L.R. 1258].)

Thus, the purpose of the overtime provisions of FLSA parallels the purpose of IWC's wage orders. California law does differ from FLSA somewhat in that California puts a cap not only on the number of hours an employee may be employed in a workweek, but also the number of hours the employee may be employed in a workday. (Compare Order 9-80, § 3(A) and 29 U.S.C. § 201 et seq.)

The United States Supreme Court noted that: "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." (*United States* v. *Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 131 [88 L.Ed.2d 419, 429, 106 S.Ct. 455].) The Department of Labor enforces FLSA (29 U.S.C. § 204), and its interpretation of FLSA is entitled to great respect. (*Bumpus* v. *Continental Baking Co., supra,* 124 F.2d 549, 552.)

Two provisions of FLSA prohibit pyramiding when daily and weekly overtime limitations are required. First, FLSA provides that for employment in a hospital or establishment engaged in care of the sick, aged or mentally ill, the overtime requirements of FLSA section 207(a) will not be violated if in lieu of the workweek of seven consecutive days, there is an agreement between the employer and the employee for a work period of fourteen consecutive days for purposes of overtime computation, and "if, for his employment in excess of eight hours in any workday and in excess of eighty hours in such fourteen-day period, the employee receives compensation at a rate not less than one and one-half times the regular rate at which he is employed." (29 U.S.C. § 207(j).)

A literal reading of this section would appear to require pyramiding. However, Department of Labor regulations specifically authorize "any payments at the premium rate for daily overtime hours within such period may

be credited toward the overtime compensation due for overtime hours in excess of 80." (29 C.F.R. § 778.601(d).)

Second, FLSA section 7(b)(3) requires for employees in independently owned and controlled local enterprises distributing petroleum products overtime for hours over 12 in a workday or 56 in a workweek. (29 U.S.C. § 207(b)(3).) Again, Department of Labor regulations provide that: "Under these provisions, when an employee works in excess of both the daily and weekly maximum hours standards in any workweek for which such an exemption is claimed, he must be paid at such overtime rate for all hours worked in the workweek in excess of the applicable daily maximum or in excess of the applicable weekly maximum, *whichever number of hours is greater.*" (Italics added.) (29 C.F.R. § 778.602(a).)

6. *The rule*

 Since the method of calculating overtime used by DLSE has also been applied by the Department of Labor and the method used by the trial court would lead to unreasonable results, we hold that in calculating overtime pursuant to section 3(A), an employer should review the employee's hours worked at the end of the week, determine the daily and weekly overtime hours, and pay the employee for the greater number of overtime hours. Daily overtime hours should include calculations as to double time. The weekly overtime trigger of 40 hours is reached after the employee has worked 40 hours at straight or regular time, not the first 40 hours. Since appellant paid respondents for 14 hours at straight time, it is obvious that a recalculation of overtime owed is still necessary.

C. *Under Order 9-80, an Agreement to Exclude Sleep Time Need Not Be in Writing*

 The trial court found that since appellant did not comply with section 3(G)'s requirement for a written agreement and since there was not a regularly scheduled sleep period, every hour of every shift was compensable time, with the exception of the two one-hour meal periods. Appellant argues that the trial court lumped together 2 distinct issues: (1) which hours of a 24-hour shift are compensable, and (2) whether the daily overtime requirements of Order 9-80 apply to 24-hour shifts. We agree. The issue of whether or not sleep time can be excluded from compensable time is not the same as the issue of what rate should be paid for sleep time when it is included in compensable time.

The issue we are called upon to decide regarding sleep time is whether or not an employer of ambulance drivers and attendants can have an agree-

ment, other than a written agreement, with such employees to exclude sleep time from compensable time. We conclude that such an agreement is feasible under Order 9-80.

Attached to appellant's trial brief is a document entitled "MEMORANDUM TO THE INDUSTRIAL WELFARE COMMISSION . . . REGARDING THE HISTORY AND MEANING OF SECTION 3[G] OF ORDER 9-80 (TRANSPORTATION)." In this memorandum, the California Ambulance Association (CAA) set out its opinion of the purpose behind section 3(G). Of course, even if properly authenticated, such an opinion is entitled to very little weight as a statement of the intent of IWC in enacting section 3(G) as opposed to evidence of an employer's intent in adopting an agreement to conform with the order.[13]

However, we do note that appellant's reply brief here contains the following quote from CAA's memorandum: "The primary purpose of section 3[G] was to relieve the twenty-four hour schedule from the daily overtime requirements. The purpose was not to regulate the meal and sleep periods. *The rules for meal and sleep periods were already set forth* in the U.S. Department of Labor's interpretative bulletin. See 29 CFR § 785.22, . . . Thus, it was not necessary to cover this subject under section 3[G]." (Italics added.)

This federal rule (29 C.F.R. 785.22) provides that when an employee works 24 hours or more, the employer and the employee may agree to exclude a "regularly scheduled sleeping period of not more than 8 hours

---

[13] Attached to appellant's trial brief is "EXHIBITS TO TRIAL BRIEF." The exhibits consist of a declaration filed by CAA's attorney Robert W. Tollen in support of a summary judgment motion in *Auchmoody* v. *911 Emergency Services* (1989) 214 Cal.App.3d 1510 [263 Cal.Rptr. 278]. On this appeal, Tollen is representing appellant and has filed an amicus curiae brief on behalf of CAA.

There is no affidavit authenticating this exhibit (i.e., the previous declaration). In turn, attached to the previously used declaration are several exhibits, which were not authenticated at the time of submission. There was, however, a supplemental declaration by Tollen authenticating most of the exhibits, except for original declarations.

Amicus curiae CAA notes that use of the Tollen declaration was approved in *Auchmoody* in which the court noted that Tollen had: "[E]stablished his experience and expertise in the field of labor law particularly concerning wage and hour provisions. He was qualified to review the historical background of the Wage Order and his personal knowledge of its administrative adoption in which he participated as an expert." (214 Cal.App.3d at p. 1518.) However, the court also stated that: "Even though the transcript of conversations with Ms. Christensen and her interpretation of what the 24-hour agreement should contain might not be entitled to official sanction, respondent presented declarations of persons who attended hearings on Wage Order 9-80 and who were intimately involved with its drafting. These declarations were *relevant to respondent's knowledge of the order and adoption of an agreement to conform with it.* Moreover, even the Christensen transcript was admissible for the nonhearsay *purpose of explaining respondent's action in adopting the form of the agreement.*" (Italics added.) (*Ibid.*)

. . . provided adequate sleeping facilities are furnished by the employer *and the employee can usually enjoy an uninterrupted night's sleep*." (Italics added.) (29 C.F.R. 785.22.) Thus, this rule appears to permit sleep periods to be excluded only when the sleeping period is regularly scheduled and usually uninterrupted, two conditions which did not exist in the instant case.

Appellant further quotes CAA's memorandum that: "an exclusion for eating and sleeping periods did not need to be written into the transportation order, because those periods could already be excluded merely by following federal interpretations and federal court precedents."

Federal courts have interpreted 29 Code of Federal Regulations section 785.22 to have three requirements for the exclusion of sleep time on twenty-four-hour shifts: "(1) agreement between the employer and employees to exclude sleeping time from hours worked; (2) adequate sleeping facilities; and (3) opportunity by the employees to enjoy an uninterrupted 'night's sleep.'" (*Ariens* v. *Olin Mathieson Chemical Corporation* (6th Cir. 1967) 382 F.2d 192, 197.) Thus, court interpretation of this rule requires an uninterrupted night's sleep in order to exclude sleep time.

On the other hand, this regulation was based on several federal cases, including *Skidmore* v. *Swift & Co.* (1944) 323 U.S. 134 [89 L.Ed. 124, 65 S.Ct. 161], in which the United States Supreme Court considered the question of whether firemen were entitled to be paid for waiting. The Supreme Court held that: "[N]o principle of law . . . precludes waiting time from also being working time . . . . Whether in a concrete case such time falls within or without [FLSA] is a question of fact to be resolved by appropriate findings of the trial court. [Citation.] *This involves scrutiny and construction of the agreements* between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself . . . . The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was." (Italics added.) (*Id.*, at pp. 136-137 [89 L.Ed. at pp. 128-129].)

In *General Electric Co.* v. *Porter* (9th Cir. 1953) 208 F.2d 805, another case cited in 29 Code of Federal Regulations section 785.22, citing the above quote from *Skidmore*, the court reasoned that: "whether or not sleeping time falls within [FLSA] *depends upon the express or implied agreement of the parties, and in the absence of an agreement, the nature of the service and its relation to the waiting time.*" (Italics added.) (*Id.*, at p. 814.)

Thus, it is not altogether clear whether federal law and precedent require that in order to have an agreement to exclude sleep time, an employee must usually have an uninterrupted night's sleep. Case law on which the regulation is based seems to indicate that such a consideration is not required. A federal document[14] for ambulance service establishments supports this position. (See U.S. Dept. of Labor, Wage and Hour Div., Ambulance Service Establishments Under the Fair Labor Standards Act (rev. Mar. 1977) WH Publication 1327.)

This document provides that: "Where employees have duty shifts of 24 hours or longer, they may agree with the employer that bona fide sleeping periods . . . will not be counted as hours worked. If sleeping time is interrupted by a call to duty, the time of the interruption must be counted as time worked. If the employee does not get at least five hours of sleep during the scheduled sleeping period, the entire time is working time. These five hours need not be five continuous uninterrupted hours of sleep. However, if interruptions are so frequent as to prevent reasonable periods of sleep totalling at least five hours, the entire period would be considered hours worked. If agreed to in advance and sleeping facilities are furnished, a maximum of eight hours of sleeping time may be excluded from hours worked in any 24-hour period, . . ." (U.S. Dept. of Labor, Wage and Hour Div., Ambulance Service Establishments Under the Fair Labor Standards Act, *supra,* WH Publication 1327 at p. 7.)

Therefore, looking at the federal law as a whole, it appears that federal law permits an agreement to exclude a maximum of eight hours of sleep time from compensable time for ambulance drivers on twenty-four-hour shifts as long as the employee gets at least five hours of sleep and adequate sleeping facilities are furnished. We now turn to the question of under what conditions, if any, California law permits agreements to exclude sleep time.

Simmons, Wage and Hour Manual for California Employers, *supra,* § 7.8, pages 185-187, the treatise cited by DLSE as containing the correct interpretation of overtime compensation, states that the state enforcement policy for sleep time closely resembles the federal policy. Simmons states that for 24-hour shifts "the employer and employee may agree to exclude from hours worked a bona fide regularly scheduled sleeping period of not more than eight hours, provided (1) adequate sleeping facilities are fur-

---

[14] We note that the document states that it "is for general information and is not to be considered in the same light as official statements of position contained in Interpretative Bulletins and other such releases formally adopted and published in the Federal Register." (U.S. Dept. of Labor, Wage and Hour Div., Ambulance Service Establishments Under the Fair Labor Standards Act, *supra,* WH Publication 1327.) Therefore, we treat this document as indicating the federal position rather than as the definitive statement of the federal position.

nished, (2) the employee can usually enjoy an uninterrupted 'night's' sleep, (3) interruptions of the sleeping period by a call to duty are counted as hours worked, and (4) at least five hours' sleep is possible during the scheduled sleeping period . . . ." (*Id.* at p. 186.) Again, California seems to generally require an uninterrupted sleep period in order to agree to exclude the sleep period from hours worked.

On the other hand, the portion of DLSE's current guidelines pertaining to ambulance drivers and attendants provides that: "On shifts of 24 hours or more, sleep time . . . may be excluded from hours worked. The sleep time exclusion is limited to no more than eight hours during each 24 hours of duty, and the employer must furnish adequate sleeping facilities. If the employee does not have the opportunity to get at least five hours of sleep, the entire time scheduled for sleeping must be considered as hours worked. These five hours need not be five continuous uninterrupted hours of sleep. However, if interruptions are so frequent as to prevent reasonable periods of sleep totalling at least five hours, the entire period would be considered hours worked." (DLSE, Informational Guidelines on Interpretation of Industrial Welfare Com. Orders, § 227.30 at p. 39.)

Section 3(G) of Order 9-80 was added in 1976 when IWC "recognized the unique need for 24-hour coverage by ambulance service and the special circumstances under which most ambulance drivers work, and allowed relaxation of daily overtime requirements for such drivers under certain protective conditions." (Statement as to the basis upon which Industrial Welfare Commission Order 9-80 . . . is predicated, *supra*, § 3.)

In response to questions raised concerning the proper interpretation of section 3(G), IWC issued a "Statement on Special Provision for Ambulance Industry in Orders 5-80 and 9-80, adopted by [IWC] on October 16, 1981." In it, IWC states that: "If the employee does not have the opportunity to get at least five hours of sleep, the entire time (that is, the sleeping time) must be considered as hours worked. The five hours of sleep need not be continuous, uninterrupted hours of sleep. *The exemption from the daily overtime requirement is established by the agreement, and the question of interrupted sleep period affects the issue of compensable hours and not relief from necessary overtime itself.* For example, if one assumes a valid agreement that meets the minimum requirement of Sections 3[G] or 3(H), and pursuant to this agreement the employee is scheduled for eight hours of sleep time and three one-hour meal periods, and if one assumes further that due to interruptions in his scheduled sleep period he only gets four hours of sleep, our view is that for that day, compensable hours are 24 hours minus three for the valid meal exclusion, or 21 hours. If we assume further that his rate of pay is $4 an hour, the proper payment for that day would be four times 21 or $84." (Italics added.)

Thus, although not crystal clear, it appears that IWC considered the failure to comply with section 3(G) as exposing an employer to the daily overtime requirements of section 3(A), but such failure did not affect the right of parties to agree that up to eight hours sleep time of a twenty-four-hour shift might be excluded from compensable time.

These documents indicate that IWC considers an agreement to exclude sleep time acceptable. What is not clear is whether IWC intended by its enactment of section 3(G), requiring a written agreement to relieve an employer of the daily overtime provisions of section 3(A), to limit an agreement to exclude sleep and meal times from compensable time to one in writing. Even assuming that the IWC's historical rule had been to permit the exclusion of sleep and meal periods, that does not preclude a possible change to require that the exclusion be in writing.

Our concern over the lack of clarity of IWC's intent is further complicated because DLSE, under whose enforcement policy the exclusion was supposedly permitted, argues in its amicus brief that the agreement must be in writing. DLSE urges us to apply the general principle that statutes which confer an express exemption from a regulatory scheme are narrowly construed and will not be extended beyond the import of their terms. (*San Diego Union* v. *City Council* (1983) 146 Cal.App.3d 947, 954 [196 Cal.Rptr. 45].)

DLSE claims that section 3(G) was patterned after the language contained in 29 Code of Federal Regulations, section 785.22, that DLSE adopted an enforcement policy which mirrored that of the United States Department of Labor, and that it has never considered the United States Supreme Court cases defining "hours worked" for the purposes of FLSA as dispositive. No legal authority is offered for any of these propositions, though DLSE does argue that the definition of "hours worked" is different under FLSA and IWC's wage orders.

Federal regulations define "hours worked" under FLSA as "all hours are worked which the employee is required to give his employer, that 'an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.'" (29 C.F.R. 785.7.) "The workweek ordinarily includes 'all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place.'" (*Ibid.*)

Section 2(G) defines "hours worked" as "the time during which an employee is *subject to the control* of the employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do

so." (Italics added.) Given the similar purpose behind FLSA and the wage orders, we conclude that although the definitions of "hours worked" are not the same, they are parallel, and therefore federal precedent is entitled to some deference.

DLSE states that it considers section 3(G) as a limited exception to the broad definition of hours worked contained in section 2(G) of Order 9-80. Although it is obvious that section 3(G) differs from the federal regulation in that it is limited to ambulance drivers and attendants and contains the requirement that the agreement must be in writing, we conclude that section 3(G) is an exception to 3(A)'s daily overtime requirement, not section 2(A)'s definition of hours worked.

Therefore, we hold that it is permissible for an employer and ambulance drivers and attendants to enter into an agreement, which need not be written, to exclude up to eight hours of sleep time from work or compensable time on twenty-four-hour shifts if adequate sleeping facilities are provided by the employer and the employee has the opportunity to get at least five hours of uninterrupted sleep. If the employee does not get five hours of uninterrupted sleep, then the entire time must be considered as hours worked.

Section 7(A) requires every employer to keep accurate information with respect to each employee including: "Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded . . . ." We hold that under section 7(A), the employer must keep records of sleep periods. ■ "[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages." (*Hernandez* v. *Mendoza, supra*, 199 Cal.App.3d 721, 727.)

■ We further hold that since an agreement to exclude sleep time from compensable time is an exception to the requirement that employees be paid for "hours worked," it is the burden of the employer to prove that an agreement exists and what the terms of the agreement are.

The question now becomes what was the agreement in this case. Other than one employment agreement for twenty-four-hour shifts signed by one respondent late in 1982, no written agreement was introduced into evidence. Appellant asserts that "the evidence was undisputed and undisputable that every employee had agreed *in fact* to that system [i.e., appellant's compensation system]." (Original italics.)

What the evidence established was that respondents testified that they understood that they would not be paid for eight hours of uninterrupted sleep. Accordingly, the agreement here was simply that employees would not be paid if they got eight hours of uninterrupted sleep. Substantial evidence indicates that the employees rarely received eight hours of uninterrupted sleep.

Appellant argues that the judgment should be reversed insofar as it awards compensation for all hours of every night. Our review of this issue is hampered by the fact that the stipulation entered into by the parties seems to have included compensation for the error made by appellant in paying employees for only five hours of time and one-half when the employee did not receive five hours of sleep instead of the eight hours that appellant acknowledges it was required to pay. (See fn. 4.) In other words, despite the court's finding, the judgment does not appear to include compensation for every hour of every night.

Pursuant to our holding, appellant will have to pay respondents for eight hours' sleep time per twenty-four-hour shift, except for those shifts on which an individual respondent received eight hours of uninterrupted sleep. On remand, it will be appellant's burden to show on which shifts a respondent received eight hours of uninterrupted sleep. Appellant's task may be a difficult one given that at best, appellant only "guesstimated" the sleep time rather than recording it accurately. It appears that appellant counted the time between runs as sleep time even though some of that time might have been spent at meals, reloading the truck, or on other duties.

III. The Court Did Not Err in Awarding Judgments to the Four Respondents Who Did Not Appear at Trial

Appellant argues that the four respondents who did not appear at trial did not demonstrate if and when they had worked twenty-four-hour shifts nor did they controvert the testimony of appellant's manager that he had personally witnessed every one of the employees sign an employment agreement setting forth appellant's compensation system.

Since the parties had stipulated to the amount of wages due, part of the trial was really a trial on a question of law—the proper method of calculating overtime. The stipulation was based upon hours worked by each respondent. Attached to the stipulation was an example of one employee's hours, showing the 24-hour shifts. The termination date of each respondent was placed in evidence. Furthermore, portions of interrogatory answers dealing with 24-hour shifts and sleep time by the 4 absent respondents were read

into the record. Accordingly, no appearance was necessary to establish that they had worked 24-hour shifts.

Regarding the factual question of whether there was a written agreement, appellant admitted in answers to interrogatories that none of the employees had a written employment agreement. The trial court found that no written agreements existed. We infer that the court did not believe the testimony of appellant's manager that he had witnessed each employee sign a written agreement. Accordingly, since no agreements were introduced into evidence, it was unnecessary for the other four respondents to refute the claim personally.

## DISPOSITION

The portion of the judgment denying appellant's motions to dismiss and for judgment against the four nonappearing respondents is affirmed. The portion of the judgment awarding overtime compensation to respondents is reversed and remanded with direction to the superior court to recalculate the amount of overtime owed to respondents in accord with the methods discussed in this opinion. Overtime is to be calculated by the method set out in part II(B)(6) of this opinion. Furthermore, respondents are to be compensated at the rate of time and a half for the eight hour sleep period on each twenty-four-hour shift worked unless appellant can establish that the employee received eight hours' uninterrupted sleep.

On remand, it would be helpful if the parties entered into a stipulation as to the amount of damages owed to each respondent. If the parties are unwilling or unable to enter a stipulation, then the trial court will have to decide the factual question of the compensation due each respondent.

Each side to bear its own costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J., Concurring and Dissenting.**—In this case, there is little difference in practical effect between the amount of damages the majority opinion would allow and the damages which would be achieved were the rationale of this dissent to prevail. Nonetheless, I write separately to express my disagreement, in part, with the rationale of the majority opinion. In particular, I disagree with the majority's argument that agreements to ex-

clude sleep time for ambulance drivers need not be in writing under controlling California law.[1]

It does not require a lengthy opinion to explain the grounds of my disagreement because all that is required is strict construction of the crystal clear language of the relevant order issued by the California regulatory body with jurisdiction over the wages and hours of California ambulance drivers. That language, as will be recalled, expressly states: "The daily overtime provisions of subsection (A) shall not apply to ambulance drivers and attendants scheduled for twenty-four (24) hour shifts of duty who have agreed *in writing* to exclude from daily time worked not more than three (3) meal periods of not more than one hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours." (IWC Order 9-80, § 3(G), italics added.)

By its terms this requires exclusions from "time worked" to be in writing. In the absence of a written agreement the "time worked" includes hours which indeed may be part of a regularly scheduled uninterrupted sleeping period.

The majority looks at a comparable provision in the federal regulations (29 C.F.R. § 785.22), as well as federal cases interpreting this provision and defining "work time." They treat this federal law as dispositive in interpreting Industrial Welfare Commission (IWC) Order 9-80, section 3(G). Using a convoluted reading of these federal interpretations of federal law, the majority, in turn, concludes ambulance drivers can exclude sleep and meal time from work time through an oral agreement. However, this argument overlooks the well-settled, commonsense principle that federal interpretations of the federal labor laws are not controlling in any sense where, as here, the language and intent of IWC orders differ in language and intent from the federal statutes and regulations. (*Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239 [211 Cal.Rptr. 792].)

California's IWC orders differ from federal law in three salient respects. First, California law defines "hours worked" differently than federal law. Indeed, the Fair Labor Standards Act does not specifically define "hours worked." The controlling *federal* definition, therefore, is found in a Supreme Court opinion which includes "all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a

---

[1] Despite this interpretation of the law, the majority decides the respondent ambulance drivers are entitled to pay for "sleep time" for any night they were denied eight hours of uninterrupted sleep. They reach this conclusion because the alleged oral agreements evidently only excluded sleep time if the driver actually enjoyed eight uninterrupted hours.

prescribed work place." (*Anderson* v. *Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 690-691 [90 L.Ed. 1515, 1525, 66 S.Ct. 1187].) Federal regulations, in turn, interpret this to exclude from "work time" periods during which the employee is at the employer's premises but "relieved of all duty." (See, e.g., 29 C.F.R. § 785.19(b) excluding meal hours required to be taken on the employer's premises while the employee is relieved of other duties.)

Contrast this federal interpretation with the California definition that considers "hours worked" to include all "the time during which an employee is subject to the control of the employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so. . . ." (IWC Order 9-80, § 2(G).) An ambulance driver who is sleeping in a designated sleeping area may well not be "on duty" or "at a prescribed work place." However, he or she is definitely "subject to the control of the employer." Thus, in the absence of some specific exception, such as provided in IWC Order 9-80, section 3(G), his or her sleep and mealtime counts as "hours worked" under the California rules.

California and federal law next differ in the types of employees permitted to agree to exclude sleep and mealtime. The California provision is expressly limited to ambulance drivers and attendants. (IWC Order 9-80, § 3(G).) The federal regulation contains no such limitation. (29 C.F.R. § 785.22.) Language and interpretations aimed at authorizing agreements in a wide range of occupations and employment situations have little relevance in construing a narrow exception targeted on a single category of employee working in a single industry. Obviously regulators can define the terms and conditions of the exception with more precision when they know which sort of employees and what type of work place they are addressing. They need have less fear the regulation will trigger unforeseen consequences in some industry they had not considered when drafting the regulation.

Third, and most importantly, California and federal law differ in the requirement the exclusion of sleep and mealtime from "hours worked" be in the form of a written agreement. The comparable federal regulation (29 C.F.R. § 785.22) contains no requirement the agreement be in writing. The California one does—in no uncertain terms. (IWC Order 9-80, § 3(G).)

There is no dispute appellant ambulance company failed to abide by the requirement to obtain *written* agreements from respondent ambulance drivers. Accordingly, this time counts as "hours worked" as defined in IWC Order 9-80, section 2(G) despite any *oral* agreements that might have existed. As a result, I would hold respondents are entitled to compensation for those hours.

I am not persuaded to a different conclusion by the curious argument appellant makes, supported by self-serving declarations of doubtful admissibility, that IWC Order 9-80, section 3(G) does not define the terms under which sleep and mealtime can be excluded from "hours worked" for California ambulance drivers.

The majority accepts this argument which starts with the assertion the California Division of Labor Standards Enforcement (DLSE) as well as federal regulators accept the federal definition of "hours worked" and the circumstances under which "sleep time" can be excluded. However, DLSE filed an amicus curiae brief in this case taking a position directly opposite. DLSE pointed out California law has an express definition of "hours worked," which definition is different from the one arrived at in federal judicial opinions. DLSE takes the position it is *California* law which defines "hours worked" in such a broad way as to encompass sleep time and it is *California* law which defines the terms and conditions under which this narrow class of employees—ambulance drivers and attendants—can be deprived of compensation for their sleep time.

For reasons expressed above, I agree with the DLSE view of these California regulations governing wages and hours in California workplaces. True, in this instance these regulations afford somewhat greater protections for California workers than they would enjoy under federal law. But that was their intent. In my view, we should implement not defeat that intent.

A petition for a rehearing was denied October 25, 1990.