Filed 5/28/15  Kirner v. Explorer 1 Ambulance etc. Services CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TAYLER KIRNER et al., | B255651 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. BC498428) |
| EXPLORER 1 AMBULANCE & MEDICAL SERVICES, LLC et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard Fruin, Judge.  Affirmed in part, reversed in part and remanded.

Parker, Milliken, Clark, O'Hara & Samuelian, Gary Ganchrow and Alan Weinfeld; Law Offices of Michael A. Lotta, Inc. and Michael A. Lotta for Defendants and Appellants.

Marchetti Law and Frank E. Marchetti for Plaintiffs and Respondents.

Explorer 1 Ambulance & Medical Services, LLC (Explorer 1) and Sultan Mohamed (Mohamed) (collectively appellants) appeal from a judgment following a court trial against appellants and in favor of respondents Tayler Kirner (Kirner), Brian Richard (Richard), and Damien Stickler (Stickler) (collectively respondents) on respondents' claims against appellants for wage and hour violations.

Appellants argue that substantial evidence does not support the trial court's decisions that Mohamed is Explorer 1's alter ego and that Kirner and Richard had no agreement or understanding to exclude sleep time from 24-hour shifts. In addition, appellants argue that the trial court made an error of law in awarding penalties under Labor Code section 558.[1]

We find that the award of penalties under section 558 must be reversed and remanded for further consideration in the trial court. We affirm the judgment in all other respects.

## FACTUAL BACKGROUND

Mohamed formed Explorer 1 in 2009. He initially capitalized the venture with $500,000. The following year, he contributed an additional $30,000 in capital, and subsequently continued to capitalize the company by loaning it approximately $2 million for property, equipment, payroll and supplies. Mohamed has been Explorer 1's sole member and manager since its inception.

Kirner, Richard, and Stickler worked as emergency medical technicians (EMTs), driving ambulances for appellants. Kirner worked from April 1, 2011, through September 6, 2012. Richard worked from June 2011 through June 2012. Stickler worked from July 2011 through October 2011.

Respondents did not use a time clock, did not keep track of meal breaks, and were not paid for overtime. There were no scheduled breaks. There was no method used to keep track of hours worked or sleep time. Respondents worked either a "day car shift," which would last from 1 hour to 16 hours, or a 24-hour shift. Respondents were also

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

required to work special events, and unless the event occurred during a regularly scheduled shift, respondents would be required to volunteer their time at these events. Mohamed told respondents that if they did not volunteer at the event, they would be terminated from employment. Respondents were never paid overtime, no matter how many hours they worked in a day or in a week. Respondents believed they should be paid overtime, however when they approached Mohamed about this issue, he informed respondents that they could leave the job.

Respondents were paid every two weeks. When respondents brought to Mohamed's attention that their actual hours worked were different from what their pay reflected, they were told, "there's the door." Respondents did not have an understanding of how Mohamed came up with the number of hours for which he paid them. Respondents did not sign any written agreement regarding how they were to be paid when they worked a 24-hour shift, nor did they enter an oral agreement regarding how they were to be paid when they worked a 24-hour shift. They never agreed that they would not be paid for time that they were sleeping or not running calls.[2]

Every week, respondents and other employees signed time sheets. However, the hours actually worked did not match the hours recorded on the time sheet. If respondents ever questioned the discrepancy between the hours they actually worked and the hours on the time sheet, Mohamed would state, "If you don't like your job, there's the door." When Kirner refused to sign the time sheet, Mohamed withheld Kirner's pay until he signed. Kirner testified he was afraid he would not find employment elsewhere, so he continued to accept the insufficient payments. Kirner stated, "I signed each and every time. I had a family to take care of." Richard also testified that he accepted the insufficient pay, stating: "having some income is better than having no income at all."

---

**2**    Mohamed contradicted the testimony of respondents, stating that he had informed them that he would pay 13 hours out of a 24-hour shift. Mohamed testified that he memorialized this policy in writing with a document referred to as a shift schedule. The shift schedule was not signed by any party.

3

When Kirner questioned the accuracy of the forms he was signing, Mohamed sometimes stated that he would put the missing pay on the following week's paycheck. However, the missing pay was never provided. When Kirner pointed out that he was working hours that were not even reflected on the master time sheet, Mohamed told him, "Those were volunteer times."

The trial court noted its concern that there was no accurate record of the hours worked by respondents. Although the master time sheets were produced, there were gaps in the records during the relevant time frame. The records produced were missing May to July 2011, half of August 2011, all of September 2011, most of October 2011, the last half of November 2011, all of December 2011, half of January 2012, the last half of March 2012, all of April 2012, part of May 2012, all of June 2012, and all but the last three days of July 2012. Appellants also failed to produce dispatch records or other reports that would show what dates and times respondents were dispatched out on calls. Appellants stated they had destroyed the records and had no other records to produce.

Respondents' duties included transporting patients; maintaining the station and building; running errands; and watching Mohamed's children. Mohamed used the company supervisor's truck as his own personal vehicle. Mohamed also sent Stickler to the grocery store to purchase groceries for Mohamed's family. Respondents were required to do mechanical work on Mohamed's personal vehicles, pick up Mohamed's personal dry cleaning, and drive Mohamed to the utility company so that he could pay his personal bills. Kirner moved Mohamed's personal belongings to a storage unit. Mohamed's father, who was homeless, would reside at the ambulance station for periods of a week to a month, or sometimes for just an occasional day. When Mohamed was unable to get in touch with his father, he would send employees to search for him during their shift.

Mohamed testified that he is the owner of Explorer 1, but has never been employed by Explorer 1. He has never collected a paycheck from Explorer 1. Explorer 1 has always operated at a loss. Explorer 1 did not pay taxes for 2010, 2011 or 2013 because of the losses for those years. Mohamed loaned Explorer 1 about $2 million of

4

his personal money. Mohamed pays his wife a salary to work as a clerk for Explorer 1, and she covers the personal bills and rent for the family. Mohamed testified that he believed he filed an operating agreement for Explorer 1 with the Secretary of State, however none was produced in this action.

**PROCEDURAL HISTORY**

On December 31, 2012, respondents filed their complaint against appellants for: (1) failure to pay overtime compensation in violation of sections 510, 1194, and 1198; (2) failure to pay wages; (3) waiting time penalties under section 203; (4) violation of section 226, subdivision (a); (5) civil penalty for Labor Code violations pursuant to section 558; (6) unfair business practices under Business & Professions Code section 17200, et seq.; (7) conversion under Civil Code section 3336; and (8) unjust enrichment under Civil Code section 3426.3.

Appellants filed an answer on April 18, 2013.

The matter proceeded to a bench trial, which commenced on January 7, 2014. On January 14, 2014, the court announced its decision on the record. The court found that no written or verbal agreement for respondents to receive less than pay for the full 24 hours of a 24-hour shift was proved in this case. The shift scheduling document, which described the 24-hour shift, was not signed by any party.

The court held that alter ego was established by the evidence. In support of this finding, the court noted that its decision was based principally on the evidence that the business was operating at a loss from the beginning and was not filing tax returns.

The trial court found for respondents on their claims for: (1) failure to pay overtime compensation; (2) failure to pay wages; (3) waiting time penalties; (4) violation of section 226, subdivision (a) (requiring employers to provide accurate itemized statements in writing showing hours worked, gross wages, deductions, and net pay, among other things); (5) civil penalty for violation of section 558 (providing for a civil penalty against any employer who violates a section of that chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission (IWC)); and (6) issued an injunction under Business & Professions Code section 17200.

5

The court found in favor of appellants on respondents' claims for conversion and unjust enrichment.

The trial court's awards were based on respondents' computations. Kirner was awarded $65,517.50 in unpaid wages and overtime; $6,480 in section 203 penalties; $3,550 in section 226 penalties; and $3,550 in section 558 penalties.

Richard was awarded $43,062.50 in unpaid wages and overtime; $9,450 in section 203 penalties; $2,450 in section 226 penalties; and $2,450 in section 558 penalties.

Stickler was awarded $11,320 in unpaid wages and overtime; $9,000 in section 203 penalties; $550 in section 226 penalties; and $550 in section 558 penalties.

On April 16, 2014, the trial court amended the judgment to include an award in respondents' favor of $85,181.50 in attorney fees and $7,756.41 in costs.

Appellants filed their notice of appeal on April 15, 2014.

## DISCUSSION

### I. Alter ego finding

Appellants' first argument is that the trial court's finding of alter ego liability is not supported by substantial evidence.

#### A. *Standard of review*

Under the substantial evidence standard, "the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.* [Citations.]" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 (*Bowers*).)

However, substantial evidence must be "'of ponderable legal significance." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) It must be reasonable, credible, and of solid value. (*Ibid.*) "The ultimate determination is whether a

6

*reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.]" (*Ibid.*)

### B. *The doctrine of alter ego*

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. [Citations.]" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora*).) However, the corporate identity may be disregarded, and the corporate veil pierced, "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. [Citation.]" (*Ibid.*) Thus, under the alter ego doctrine, "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. [Citations.]" (*Ibid.*)

Two conditions must be met before the alter ego doctrine will be invoked: "First, there must be such unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. [Citations.]" (*Sonora, supra*, 83 Cal.App.4th at p. 538.) "Alter ego is an extreme remedy, sparingly used. [Citation.]" (*Id.* at p. 539.)

Numerous factors may be considered in deciding whether to apply the doctrine of alter ego. As set forth in *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838-840 (*Associated Vendors*), among the factors to be considered are:

> "Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses [citations]; the treatment by an individual of the assets of the corporation as his own [citations]; the failure to obtain authority to issue stock or to subscribe to or issue the same [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate

7

entities [citations]; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family [citations]; the use of the same office or business location; the employment of the same employees and/or attorney [citations]; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; the use of the corporate entity to procure labor, services or merchandise for another person or entity [citations]; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations]; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions [citations]; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citations]."

"No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied. [Citation.]" (*Sonora, supra*, 83 Cal.App.4th at p. 539.)

### C. *The evidence supports the trial court's alter ego determination*

The evidence showed that several of the factors listed above were present during the time of respondents' employment. Mohamed diverted corporate assets for his personal use, such as using the company supervisor's truck as his own personal vehicle; using company employees to do personal errands such as shop for groceries, watch his children, run his personal errands, and perform maintenance on his personal vehicles. In addition, Mohamed used the business address for personal reasons when he permitted his father to stay there for extended periods of time.

8

There was also evidence that Mohamed failed to maintain adequate and customary records for Explorer 1. No operating agreement or statements of information were produced in the trial court. In addition, insufficient records of employee hours and pay were maintained.

There was also evidence of commingling of funds between Mohamed's own personal funds and the company's funds. Although Mohamed managed the company, he never paid himself any wages, and he covered the company's losses personally, paying for property, equipment, payroll and supplies. In addition, the station out of which Explorer 1 operates is owned half by Mohamed and half by the company, although Mohamed testified that the company pays the full mortgage.[3] Mohamed testified that Explorer 1 pays rent to Mohamed, and he in turn lends that money back to the company. Mohamed has never received income from the company and it has never been profitable. In sum, as the trial court noted, Explorer 1 has never operated as a viable entity. Instead, Mohamed operates Explorer 1 as a personal business. Mohamed exercised domination and control of Explorer 1 and its employees, in particular by asserting his sole discretion as to how many hours to pay each employee, regardless of how many hours the employee actually worked.

This evidence supports the trial court's determination that Mohamed was the alter ego of Explorer 1, and that the doctrine should apply to pierce the corporate veil in this case.

Appellants argue that the trial court made two errors in applying the alter ego doctrine: first, it imposed alter ego liability on Mohamed merely because it found Explorer 1 to be undercapitalized; and (2) it confused undercapitalization with operating losses.

We reject Mohamed's claims. Initially, we note that the trial court did not rely exclusively on undercapitalization in imposing alter ego liability. The court indicated orally that its decision was based "principally" on the facts that the court raised during

---

[3] However, Mohamed later testified that the full mortgage is automatically withdrawn from his personal account.

9

argument. During argument, the court noted that the business was operating at a loss from the beginning; that the business did not file tax returns; and that the business was never profitable. The court's use of the term "principally" suggests that, while these financial factors were a large part of its decision, they were not the only factors it considered.[4]

In addition, the trial court did not specifically discuss undercapitalization but instead focused on the fact that the business was consistently operating at a loss. This suggests the court was also taking into consideration the practical consequences of Explorer 1's poor financial condition, such as the commingling of funds that was going on between Mohamed and Explorer 1 and Mohamed's assumption of Explorer 1's liabilities for debts such as payroll and equipment. The unhealthy financial condition of Explorer 1 -- which the trial court properly considered -- was closely linked with other factors which were also properly considered in determining alter ego.[5]

Appellants also object to the trial court's consideration of three other factors: (1) that Explorer 1 did not offer a written operating agreement; (2) that Explorer 1 did not file tax returns; and (3) that Mohamed was not an employee of the company, but nonetheless managed its affairs. Appellants argue that none of these factors support an alter ego finding.

While there was testimony that Explorer 1 did not provide an operating agreement, appellants cite no place in the record where the trial court specifically emphasized a

---

[4]    We are not required to rely on the trial court's comments from the bench during oral argument to ascertain the court's reasoning. In a non-jury trial, the appellant was permitted to preserve the court's reasoning in a statement of decision pursuant to Code of Civil Procedure section 632. (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718.) There is no statement of decision in the record. "In the absence of a statement of decision, the appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. [Citation.]" (*Ibid.*)

[5]    Appellants do not point to evidence in the record showing any confusion on the part of the trial court as to the difference between undercapitalization and operating loss, therefore we decline to address this argument.

10

concern over this fact. However, assuming the trial court did consider Explorer 1's lack of an operating agreement, we find that such consideration did not constitute error. Failure to maintain adequate corporate records is a legitimate consideration in making a determination of alter ego. (*Associated Vendors, supra*, 210 Cal.App.2d at pp. 838-840.) Appellants point out that an oral operating agreement is sufficient under former Corporations Code section 17001, however they point to no testimony suggesting that such an oral operating agreement existed. Under the circumstances, the trial court was entitled to consider the lack of an operating agreement as evidence of alter ego. As respondents pointed out in closing argument, Mohamed was commingling his assets. He was meeting payroll by funding the operation with his own money. While he ran the whole operation, he had no official title and did not pay himself. He essentially ran the company as he liked, without an operating agreement. The trial court's consideration of this evidence was proper.

Appellants next attack the trial court's consideration of Explorer 1's failure to file tax returns. As a single-member limited liability company (LLC), appellants argue, Explorer 1 is disregarded for tax purposes and is not required to file tax returns. Appellants cite 26 Code of Federal Regulations part 301.7701-3(b)(ii) (2015), which states that a domestic entity may elect to be "[d]isregarded as an entity separate from its owner if it has a single owner." While this regulation permits a single-member LLC to elect to be disregarded as a separate entity, it does not suggest that doing so may not be considered as evidence of alter ego liability. In fact, Mohamed's failure to segregate the finances of Explorer 1 from his own was a factor the trial court was permitted to consider in making its determination of alter ego. (*Associated Vendors, supra*, 210 Cal.App.2d at pp. 838-840.)

As to Mohamed's status as an individual who was not employed by Explorer 1, appellants cite former Corporations Code section 17157, subdivision (b)(2), which stated that "Every manager is an agent of the limited liability company for the purpose of its business or affairs." (Added Stats. 1994, ch. 1200, § 27; amended Stats. 2012, ch. 419, § 19, repealed Jan. 1, 2014.) Again, nothing in this section suggests it was improper for

11

the trial court to consider Mohamed's lack of employment by the company in making its determination of alter ego. The fact that Mohamed managed the daily affairs of the company without accepting any pay suggests that he was treating the assets and employees of the company as his own, which was a factor the court was entitled to consider. (*Associated Vendors, supra*, 210 Cal.App.2d at pp. 838-840.)

Appellants list evidence that contradicts the evidence presented in favor of a finding of alter ego. However, where there is "substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers, supra*, 150 Cal.App.3d at pp. 873-874.) Substantial evidence exists in the record to support the trial court's finding that application of the alter ego doctrine was proper in this case.[6]

## II. Agreement to exclude sleep time from 24-hour shifts

Appellants next argue that the trial court erred in making its factual finding that Kirner and Richard had no agreement or understanding to exclude sleep time from 24-hour shifts. Again, the substantial evidence standard applies.

---

[6]     In their reply brief, appellants raise the argument that there was no evidence to support the idea that recognizing Explorer 1 as a distinct entity would create an inequitable result or injustice. (See *Sonora, supra*, 83 Cal.App.4th at p. 538 [before application of the alter ego doctrine, the fact finder must find that "there [will] be an inequitable result if the acts in question are treated as those of the corporation alone"].) "[W]e need not consider new issues raised for the first time in a reply brief in the absence of good cause." (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 214.) Appellants have failed to show good cause. However, we note that in the context of an alter ego finding, inequity or injustice may be shown when ""there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice."' [Citations.]" (*Associated Vendors, supra*, 210 Cal.App.2d at p. 837.) Substantial evidence, discussed throughout this opinion, was found in the record to support the trial court's implied finding that such circumstances were present.

12

## A. Applicable law

Section 1173 authorizes the IWC to promulgate orders regulating wages, hours and working conditions throughout the state. (§ 1173; *Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 29 (*Monzon*).) The IWC has promulgated wage order No. 9, codified in California Code of Regulations, title 8, section 11090 (wage order No. 9).

Subdivision 2(G) of wage order No. 9 states that "'Hours worked' means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

Subdivision 3(A)(1) of wage order No. 9 states:

> "The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1 ½) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

> "(a) One and one-half (1 ½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

> "(b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek."

Subdivision 3(K) of wage order No. 9 states:

> "The daily overtime provision of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for 24-hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one (1) hour each and a

13

regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule."

Thus, the language of wage order No. 9 suggests that any agreement for ambulance drivers to receive less than 24 hours pay must be in writing. However, in *Monzon*, this court held that "it is permissible for an employer and ambulance drivers and attendants to enter into an agreement, which need not be written, to exclude up to eight hours of sleep time from work or compensable time on twenty-four-hour shifts if adequate sleeping facilities are provided by the employer and the employee has the opportunity to get at least five hours of uninterrupted sleep." (*Monzon, supra*, 224 Cal.App.3d at p. 46.)

The court further held that "since an agreement to exclude sleep time from compensable time is an exception to the requirement that employees be paid for 'hours worked,' it is the burden of the employer to prove that an agreement exists and what the terms of the agreement are." (*Monzon, supra*, 224 Cal.App.3d at p. 46.)

Justice Johnson wrote a separate concurring and dissenting opinion in *Monzon*, arguing in part that the California regulation provides, in no uncertain terms, that any exclusion of sleep and mealtime from "hours worked" must be in the form of a written agreement. (*Monzon, supra*, 224 Cal.App.3d at p. 50.)

***B. Substantial evidence supports the trial court's decision that no agreement -- written or verbal -- to receive less than 24 hours pay existed***

The trial court acknowledged that *Monzon* indicates that a verbal agreement to receive less than 24 hours pay, if proved, would be sufficient. However, the trial court found that no verbal agreement was proved in this case.

Appellants argue that the trial court's decision was not supported by substantial evidence. Appellants point out that Kirner and Richard signed weekly time sheets on numerous occasions reflecting their understanding that they would be paid 16 hours for a 24-hour shift. Appellants also point out that Kirner and Richard acknowledged in writing that (1) they had reviewed the hours in those timesheets, and (2) the resulting payment

14

was accurate and correct.  Appellants claim that this evidence shows that Kirner and Richard clearly understood their pay arrangement.

However, contrary evidence existed in the record.  Each of the respondents testified that there was no agreement or understanding regarding their pay for 24-hour shifts.  The trial court clearly weighed and considered the evidence on both sides of this issue.  The court stated:  "We have three plaintiffs testifying against one defendant.  The defendant says they looked at, read, and agreed to the shift scheduling documents that are not signed.  We got [*sic*] plaintiffs that said they did not.  We also got [*sic*] Mr. Bowers who said that he did not agree.  So I think that on the scale and by the standard that I have to measure the evidence, I would like to find for the plaintiffs."

In addition, as respondents point out, Mohamed's own actions undermine his claim that he had an agreement to pay respondents less than 24 hours for a 24-hour shift.  Under the terms of the purported agreement, set forth in the unsigned shift scheduling document, Mohamed stated that he agreed to pay respondents 13 hours out of a 24-hour shift.  However, the evidence showed that the amount that respondents were paid for the 24-hour shifts was random, reflecting no consistent pattern.  They were paid anywhere from 13 to 24 hours for the shifts, depending on how much "incentive" pay Mohamed elected to pay them.

The time sheets also do not provide evidence of a written or oral agreement regarding pay for 24-hour shifts.  Respondents testified that they were forced to sign the sheets or lose their jobs.  When they did question the accuracy of the time sheets, Mohamed would inform respondents that if they didn't like it, they could leave.  Such coercion does not constitute the type of agreement or understanding required under the law.[7]

---

[7]    We note that in *Monzon* "[t]he deposition testimony of each employee demonstrated that he understood that he would not be paid for eight hours of uninterrupted sleep."  (*Monzon, supra*, 224 Cal.App.3d at p. 24.)  Here, there was no testimony suggesting that respondents had any idea how Mohamed came up with the number of hours for which he paid them.  Respondents testified that there were no scheduled breaks, and there was no way to keep track of hours worked or sleep time.

15

In sum, substantial evidence supports the trial court's decision that no written or oral agreement existed between appellants and respondents regarding payment of less than 24 hours for a 24-hour shift.[8]

## III. Section 558 penalties

Appellants argue that the trial court erred in awarding penalties under section 558. Appellants argue that the statute is only enforceable via investigation and citation by "the Labor Commissioner" (§ 558, subd. (b)), and that a private plaintiff cannot bring a claim for penalties under section 558 unless he utilizes the procedures in the Labor Code Private Attorneys General Act (PAGA) (§ 2698 et seq.). Appellants claim that because respondents never utilized the procedures under PAGA, or even alleged in their complaint that they did so, the trial court erred in awarding penalties under section 558.

### A. Applicable law

Section 558 provides for civil penalties for an employer who violates "a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission." (§ 558, subd. (a).) However, the statute specifies that it is enforceable by investigation and citation by the Labor Commissioner. (§ 558, subd. (b).) Thus, on the face of the statute, there is no private right of action for penalties under section 558.

---

Respondents were never paid overtime, no matter how many hours they worked in a day or in a week. Respondents testified that they never agreed that they would not get paid for time that they were sleeping or not running calls.

[8]    Because we have determined that the evidence supports the trial court's decision that no agreement or understanding existed between respondents and appellants to exclude sleep time from 24-hour shifts, we need not reach the question of whether respondents were given the opportunity to receive, or usually received, five hours of uninterrupted sleep. (See *Monzon, supra*, 224 Cal.App.3d at p. 46 ["it is permissible for an employer and ambulance drivers and attendants to enter into an agreement, which need not be written, to exclude up to eight hours of sleep time from work or compensable time on twenty-four-hour shifts if adequate sleeping facilities are provided by the employer and the employee has the opportunity to get at least five hours of uninterrupted sleep"].)

However, PAGA, which became effective January 1, 2004, allows employees to "bring a civil action to collect civil penalties for Labor Code violations previously only available in enforcement actions initiated by the state's labor law enforcement agencies. [Citations.]" (*Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 374 (*Caliber*), fn. omitted.)  Section 2699.5 specifically identifies the Labor Code provisions enforceable under PAGA.  Those provisions include sections 203, 226, subdivision (a), 510, 1194, and 1198, violations of which were alleged in the first four causes of action in respondents' complaint.[9]  (§ 2699.5.)

"The Act was amended shortly after its effective date . . . to, among other things, require exhaustion of administrative procedures before an action may be filed to allow the [Labor and Workforce Development Agency] the initial opportunity to investigate and cite employers for Labor Code violations." (*Caliber, supra*, 134 Cal.App.4th at p. 375, fn. omitted.)  Section 2699.3, subdivision (a), provides the administrative procedures that must be followed before an aggrieved employee may file a civil action to recover civil penalties under section 2699 for violations of any of the Labor Code provisions identified in section 2699.5:

> "(a)  A civil action by an aggrieved employee . . . alleging a violation of any provision listed in Section 2699.5 shall commence only after the following requirements have been met:
>
> "(1)  The aggrieved employee or representative shall give written notice by certified mail to the Labor and Workforce Development Agency and the employer of the specific provisions of this code alleged to have been violated, including the facts and theories to support the alleged violation.

---

[9]     While section 558 is not specifically identified in section 2699.5, respondents' complaint alleged substantive violations of the above-referenced statutory provisions which are named in section 2699.5.  "[I]t is the request for civil penalties for an alleged violation of a substantive statutory provision listed in section 2699.5" that triggers the employee's right to bring an action under PAGA.  (*Caliber, supra*, 134 Cal.App.4th at p. 379, fn. 15.)  Respondents' fifth cause of action for civil penalties under section 558 sought civil penalties for violations of substantive provisions which are named in section 2699.5.  Thus, the PAGA is applicable to respondents' request for penalties under section 558.  (*Caliber*, at p. 379 & fn. 15.)

"(2)(A) The agency shall notify the employer and the aggrieved employee or representative by certified mail that it does not intend to investigate the alleged violation within 30 calendar days of the postmark date of the notice received pursuant to paragraph (1). Upon receipt of that notice or if no notice is provided within 33 calendar days of the postmark date of the notice given pursuant to paragraph (1), the aggrieved employee may commence a civil action pursuant to Section 2699.

(§ 2699.3, subd. (a)(1) & (2)(A).)

### B. Forfeiture

We first address respondents' claim that appellants have forfeited their right to raise the issue of whether respondents exhausted their administrative remedies, as required under PAGA. Respondents argue that an appellant cannot assert a new theory of defense on appeal. (Citing *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 13, fn. 6 [defendants' claim that certain markups were permissible due to a quantum meruit theory could not be urged on appeal because it was not raised in the trial court].) Appellants also argue that an appellant who permitted a case to be tried on the assumption that the complaint stated a cause of action may be precluded from challenging the sufficiency of the complaint for the first time on appeal. (Citing *Nelson v. Department of Alcoholic Beverage Control* (1959) 166 Cal.App.2d 783, 788 [accusation failed to state that the alleged acts occurred on the licensed premises, however such allegations were essentially in the accusation and the appellant at no time complained of the deficiency].)

Where exhaustion of administrative remedies is required, it is a jurisdictional prerequisite to the filing of a complaint. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321.) Exhaustion of administrative remedies "'is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts.' [Citation.]" (*Ibid.*) However, recent case law has suggested that a defendant waives the defense of exhaustion by failing to timely assert it in the trial court. (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 135 (*Mokler*); *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 239 (*Green*).) The rationale presented in these cases is that exhaustion is a "judicially created rule of procedure, which the courts should not allow a

18

party to use inequitably." (*Mokler, supra*, at p. 134.) "As *Green* observed, 'We think it would be grossly unfair to allow a defendant to ignore this potential procedural defense at a time when facts and memories were fresh and put a plaintiff to the time and expense of a full trial, knowing it could assert the failure to exhaust administrative remedies if it received an adverse jury verdict. The exhaustion doctrine is simply a "procedural prerequisite" [citation] the City decided to forego. . . .' [Citation.]" (*Mokler*, at pp. 134-135.)

While *Mokler* and *Green* make it clear that we may apply the waiver doctrine to a claim of failure to exhaust administrative remedies, we find that under the circumstances of this case, application of the doctrine here is inappropriate. While it is true that respondents never raised the issue of exhaustion of administrative remedies, the question of whether respondents were asserting PAGA claims was directly raised by the judge during trial. The court had before it the respondents' complaint, and asked directly: "Are there PAGA claims?" Respondents' counsel responded, "No PAGA."

Respondents' counsel's affirmative representation in open court that there were no PAGA claims in this case carried with it an implicit representation that exhaustion of administrative remedies was not an issue. While this response was likely an error rather than a deliberate attempt to mislead the court and the parties, it is also likely that the parties would be in different positions on appeal if respondents' counsel had answered the question accurately. Under the circumstances, we find that respondents are estopped from arguing that appellants waived the exhaustion argument by not raising it in the trial court. Respondents' erroneous response to the trial court's direct question could easily have misled not only the court but the appellants into thinking that exhaustion was unnecessary in this case. Respondents may not provide inaccurate information regarding the prerequisites for their claims, then argue waiver of any claims regarding those prerequisites. Under the circumstances, we find that appellants have not forfeited this issue, and it must be decided on the merits.

### C. *Reconsideration of section 558 penalties by the trial court is appropriate*

Respondents' counsel's misstatement in court caused the trial court to award section 558 penalties without consideration of whether respondents had exhausted their administrative remedies. On appeal, respondents dispute that they failed to utilize the procedures required under PAGA. While respondents' representation to the trial court that no PAGA claims were being made suggests that they did not avail themselves of those procedures, there remains some factual ambiguity as to whether or not respondents complied with PAGA prior to bringing their section 558 claim. We cannot make such a factual determination on appeal.

In addition, respondents concede on appeal that the statute of limitations for section 558 is one year (see Code Civ. Proc., § 340, subd. (a)), and thus that they were awarded more penalties than they should have been under the statute.[10]

Finally, appellants argue that the trial court erroneously awarded heightened "subsequent violation" penalties. Section 558, subdivision (a)(1), provides that for an initial violation, the civil penalty shall be $50 for each underpaid employee for the pay period for which the employee was underpaid; and for each subsequent violation, the civil penalty shall be $100 for each underpaid employee for the pay period for which the employee was underpaid. (§ 558, subd. (a)(1) & (2).) "Until the employer has been notified that it is violating a Labor Code provision . . . , the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1208-1209.) "However, after the employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as

---

**10**     Appellants argue that because the complaint was filed on December 31, 2012, respondents could only recover penalties for pay periods occurring on or after December 31, 2011. Because Stickler's employment ended in October 2011, appellants argue, he should not have received any penalties at all. Kirner could only recover penalties for pay periods occurring between December 31, 2011 and September 6, 2012, and Richard could only recover penalties for pay periods occurring between December 31, 2011 and June 2012, when his employment ended.

20

violations that are willful or intentional -- i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation." (*Id.* at p. 1209.)

Appellants argue that there is no evidence in the record that they ever received notice from a court or commissioner that they were in violation of the Labor Code. Thus, the heightened "subsequent violation" penalties were erroneous.

Under the circumstances, we must reverse and remand the award of section 558 penalties to the trial court for reconsideration. The trial court should consider: (1) whether respondents complied with the exhaustion requirements of PAGA in order to properly claim an award of penalties under section 558; and, if so, (2) the appropriate amount of such penalties, taking into consideration the relevant statute of limitations; and (3) whether notice of the initial violations was provided to appellants, justifying heightened subsequent violation penalties.

## DISPOSITION

The portion of the judgment regarding penalties awarded under section 558 is reversed and remanded with instructions to the trial court to reconsider the award in view of this opinion. The judgment is affirmed in all other respects. Respondents are awarded their costs of appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

21